# EXHIBIT 3

## THE MERGER

*The following discussion contains material information about the merger. The discussion is subject, and qualified in its entirety by reference, to the agreement and plan of merger included as **Appendix A** to this proxy statement/prospectus. We urge you to read carefully this entire proxy statement/prospectus, including the agreement and plan of merger included as **Appendix A**, for a more complete understanding of the merger.*

Hess' and American's boards of directors have approved the agreement and plan of merger. The agreement and plan of merger provides that Merger Sub, a newly-formed wholly-owned subsidiary of Hess, will merge with and into American, with American as the surviving corporation. Following the merger, American will become a wholly-owned subsidiary of Hess and will continue its corporate existence under the laws of the State of Nevada under the name American Oil & Gas Inc. or such other name as Hess may specify. Concurrently, the separate corporate existence of Merger Sub will terminate.

In the merger, each share of American common stock will be exchanged for 0.1373 shares of Hess common stock. Shares of Hess common stock issued and outstanding at the completion of the merger will remain outstanding and those stock certificates will be unaffected by the merger. Shares of Hess common stock will continue to trade on the New York Stock Exchange under the symbol "HES" following the merger.

For additional and more detailed information regarding the legal documents that govern the merger, including information about the conditions to the completion of the merger and the provisions for terminating or amending the agreement and plan of merger, see "The Agreement and Plan of Merger" beginning on page 62.

## Background of the Merger

In October 2005, American made its initial acreage acquisition of approximately 25,000 net acres in the Williston Basin of North Dakota. Through continued leasing, and three separate transactions in late 2009, American now controls approximately 85,000 net acres in the Goliath project area. The Williston Basin has become one of the most actively drilled basins in the continental United States and recent advancements in drilling, completion and stimulation technologies used by other operators have resulted in commercially successful Bakken and Three Forks wells in this basin. Additionally, in early 2010, the results of American's initial drilling activities in the Williston Basin indicated that American would have commercially successful wells in the Goliath project area.

Recognizing the challenges of successfully financing and developing its acreage position, American has devoted considerable resources to evaluating the potential for developing strategic participations and joint ventures with respect to its Williston Basin acreage positions. As American increased its acreage position in the Williston Basin, it also faced the challenge of the increasing drilling and completion costs of wells which served as a further impetus for seeking out strategic partners. Although American successfully closed on a $31,500,000 public offering of its common stock in December 2009, American recognized that, due to stock market and oil price volatility, the impact of poor general economic conditions and the difficulty in small capitalization companies accessing the capital markets, it could be difficult for American to obtain further substantial financing on a timely basis and on terms advantageous to American. American had not engaged in debt financing and management concluded that the cost of such financing, if available, and risks associated with debt financing, would likely have made debt financing undesirable and could be prohibitive. In addition to the conditions noted regarding equity financing, American's lack of significant reserves and an absence of a history of operating substantial wells would likely have made American an unattractive candidate for bank financing. American established specific criteria for selecting candidates for discussion of potential strategic transactions. A preferred candidate would:

- be significantly larger than American, both in terms of net asset value and market value;

- have quality oil and gas exploration and production assets that were commercially viable at the prevailing low energy prices;

- have considerable cash flow;

- have an interest in expanding its drilling position in the Bakken formation, or in establishing a drilling presence in the Bakken formation; and

28

- have significant operational expertise and internal infrastructure, along with the capital to deploy such operational expertise and infrastructure, and the ability to explore, drill and develop oil and gas operations in the Bakken formation.

Since February 2008, American's management, from time to time, has engaged in preliminary discussions with numerous potential joint venture or strategic partners. Several companies with which American had such discussions took the opportunity to evaluate American's oil and gas properties and to explore the potential for a merger with or acquisition of American. American has been receptive to such overtures as a potential means to maximize stockholder value. In addition to Hess, American's management, since February 2008, had preliminary discussions with and provided information for evaluation to one private company and 14 public companies with market capitalizations ranging from approximately $300 million to over $30 billion, including one publicly held oil and gas company with properties in the Williston Basin that we refer to as Company A.

Beginning in December 2008, American had exploratory discussions and shared data and other materials with Company A regarding a potential merger with Company A. In January 2009, American and Company A signed a mutual confidentiality agreement. American received a letter of intent dated March 18, 2009 from Company A that included a non-binding proposal for a merger in which Company A would have been the surviving entity. Based on the stock price of Company A on March 18, 2009, the proposed per share merger consideration represented a premium of approximately 18.8% over the closing price of $0.72 per share of American's common stock on that date. American did not sign the letter of intent, but continued to consider the proposal from Company A.

On April 3, 2009, American's board of directors held a special meeting and decided to create a special committee comprised of American's three outside directors to review the potential for a merger with Company A and to retain an investment banking firm to assist in the review. On April 21, 2009, a draft merger agreement was received by American from counsel for Company A. At a special committee meeting on April 21, 2009, the special committee decided to hire an investment banking firm to assist the special committee in its evaluation of Company A's proposal, and an engagement letter was signed with SMH Capital Inc. on April 22, 2009. From April 22, 2009 to May 1, 2009, representatives of American, SMH Capital Inc., Company A and Company A's investment banker discussed relative valuations, with particular emphasis on the valuation of American's undeveloped acreage.

On May 1, 2009, American received from Company A a revised letter of intent for a merger with merger consideration representing a 58.5% premium over American's stock price of $0.69 per share, and representatives of Company A and American and their respective investment bankers met at American's offices for several hours. The focus of the discussion was American's view that the American stock was undervalued by the market and that any offer should reflect this undervaluation. Company A did not revise its offer, noting the substantial premium to the American stock price.

On May 7, 2009, the special committee of American's board met and decided to reject the offer from Company A as inadequate and to terminate discussions with Company A. As a result, the special committee was formally disbanded and the engagement of SMH Capital Inc. formally terminated.

During late summer of 2009, American became aware through its relationship with industry participants that Hess might be interested in expanding its presence in the Bakken region. Thereafter, in early October 2009, Mr. Patrick O'Brien, Chairman and CEO of American, contacted Mr. Tom Stone, Manager, Drilling Operations U.S. Onshore with Hess, whom Mr. O'Brien knew from previous oil and gas projects, to ask Mr. Stone if Hess would be interested in reviewing the Company's operations in the Bakken region. In response, Mr. Stone indicated that he did not know whether Hess would be interested in engaging in this review, and he referred Mr. O'Brien to Mr. Randy Pharr, Hess' Land Manager — U.S. Onshore, who Mr. Stone thought would know whether Hess would have an interest in speaking with the Company. Mr. Stone then related this conversation to Mr. Pharr and provided him with Mr. O'Brien's contact information.

On October 6, 2009, Mr. Pharr called Mr. O'Brien to discuss potential opportunities for the two companies to work together in the Bakken region. During this call, the parties discussed the operations of American and Hess in the Williston Basin and possible business opportunities. Mr. Pharr informed Mr. O'Brien that, as a result of their conversation, Hess would undertake further internal evaluation. To do this, Hess would require additional

information about American's operations and Mr. O'Brien committed to deliver to Mr. Pharr a plat map and acreage information, which Mr. Pharr received in the days following the telephone call.

Following this initial telephone call, through November 2009, Mr. O'Brien and Mr. Pharr had a number of telephone calls and email exchanges in which Hess requested and American provided additional information regarding American's Goliath leaseholds, including maps, expiration terms and acreage. On November 18, Mr. O'Brien and Mr. Pharr first discussed the possibility of a strategic transaction. These calls and exchanges were for general information gathering purposes and did not involve any substantive discussions regarding the terms of any strategic transaction between Hess and American.

While American was exploring the possibility of a strategic transaction with Hess, during the fourth quarter of 2009 and in the months prior to the merger announcement with Hess, American continued its efforts to identify and communicate with other potential strategic partners regarding possible joint venture and corporate transactions that could benefit American's stockholders. These efforts were conducted by American's management with the knowledge and support of American's board of directors. During this period, American held informal calls on November 10, 2009, December 12, 2009, January 4, 2010 and May 5, 2010, as well as board meetings on January 26, 2010, February 25, 2010, March 10, 2010, April 6, 2010 and April 22, 2010, during which management discussed with, and took direction from, the board regarding operational developments and the status of discussions with various parties, including Hess, regarding potential strategic transactions. Informal calls were typically held on a monthly basis during months in which the board did not have a formal meeting. During the period from the fourth quarter of 2009 and in the months prior to the merger announcement with Hess American engaged in discussions with eleven potential strategic partners regarding a possible transaction with American, seven of which were contacted independently by American, three of which independently contacted American, and one of which was introduced to American by a third party investment banking firm, Rodman & Renshaw, LLC, on an unsolicited and uncompensated basis. The seven companies contacted independently by American met the preferred criteria of American noted above, including, among other things, being significantly larger than American, having quality oil and gas exploration and production assets, having considerable cash flow, having an interest in expanding its drilling position, or in establishing a drilling presence, in the Bakken formation and having significant operational expertise and internal infrastructure, and, in each company, there were people with whom American employees had had previous business contacts. Five of these companies signed confidentiality agreements with American, and all eleven of the companies conducted valuation analysis and due diligence on American. The evaluation process for each of these companies included at least one full day of meetings at American's offices at which there was a technical review of land, geology, operations and engineering data. American did not conduct any due diligence on these companies because discussions with such companies were never advanced enough to warrant the allocation of resources required for a diligence exercise. The possible transactions discussed with all of the companies included joint ventures or a merger with American and sales of some or all of American's assets. Each of the companies informed American that their internal valuation of American was less than American's then current market capitalization. As a result, none of the companies elected to pursue the potential of a merger with American. Four of the companies terminated discussions prior to May 2010, three terminated discussions in May 2010, two terminated discussions in June 2010 and two terminated discussions in July 2010.

American also continued its efforts to determine if Hess would be interested in pursuing a strategic transaction. On December 1, 2009, Mr. O'Brien sent an email correspondence to Mr. Pharr containing the test results for Brigham Exploration wells that had been announced publicly by Brigham Exploration that morning with high initial production rates in Williams County, North Dakota, southwest of American's Goliath block. Mr. O'Brien also stated that American was starting to build the Tong Trust well location in 157N-96WSEC20. Mr. O'Brien also mentioned recent positive results on American's Wallis 6-23 well at Fetter in the Powder River Basin of Wyoming (which was then owned by American) by attaching a press release that had been issued by American the preceding day. Mr. O'Brien also inquired about Hess' interest in entering into a strategic transaction with American.

On January 21, 2010, Mr. O'Brien again contacted Mr. Pharr by email to provide further updated information regarding American's well activity in the Goliath project area and proposing a meeting with Mr. Pharr at American's headquarters in Denver, Colorado. On January 24, 2010, Mr. Pharr called Mr. O'Brien and indicated that, based on Hess' initial review of American's properties in the Williston Basin region, Hess wanted to conduct additional due

diligence. Mr. Pharr and Mr. O'Brien agreed to schedule a visit by Hess representatives to American's offices for the following week to conduct a technical review of acreage and drilling sites.

On February 4, 2010 Mr. John Vozzo, Petroleum Engineering Advisor, Mr. Thomas Lenney, Senior Geological Advisor, and Mr. Pharr from Hess met with Mr. O'Brien, Bobby Solomon, Vice President, Economics and Financial Evaluation, Andy Calerich, President, Ken Tholstrom, Manager of Operations, Don Schroeder, Vice President Land, Brenda Beeman, Land Manager, Peter Loeffler, Vice President, Exploration and Development and Ron Lowrey, Senior Geologist, of American at American's office in Denver. There was a general discussion of American's business and outstanding projects, including a technical review of the Goliath project area and American's exploration and development activities in the Goliath project area. Discussion also was held regarding American's properties in the Powder River Basin in Wyoming. The Hess and American teams also discussed the possibilities for cooperation or strategic partnership between Hess and American without discussing any particular terms or valuations.

On February 8, 2010, Mr. Pharr contacted Mr. O'Brien and requested additional information regarding American's operations in the Bakken region. Mr. O'Brien sent a confidentiality agreement to Mr. Pharr on February 8, 2010. On February 9, 2010, American and Hess executed the confidentiality agreement which allowed Hess and its advisors to access confidential information regarding American's drilling operations, finances and structure. American thereafter provided Hess with a schedule of its anticipated drilling activities and additional information with respect to the expiration provisions of its Goliath leaseholds.

Prior to executing the confidentiality agreement between Hess and American, none of the discussions between Hess and American proceeded beyond preliminary exploratory expressions of interest, and none of the information provided by American to Hess was confidential. Following the early February contacts, Hess continued to explore internally the possibility of a strategic transaction with American.

On February 25, 2010, American issued a news release announcing a letter of intent with Chesapeake Energy for the sale by American of American's Powder River Basin properties in Wyoming.

On March 2, 2010, Mr. Louis Jones, Hess' Vice President of Developments — Unconventional Resources, contacted Mr. O'Brien to arrange a trip to American's offices for himself and Mr. Chuck Van Allen, Hess' Vice President of Production — Americas. Mr. Jones indicated to American that the purpose of his trip would be an attempt to begin negotiations regarding a possible transaction pursuant to which Hess would acquire American.

On March 4, 2010, a conference call occurred among Mr. O'Brien, Mr. Solomon, and Mr. Calerich of American and Mr. Jones and Mr. Pharr of Hess. During this call, Mr. Jones and Mr. Pharr confirmed that Hess management was interested in pursuing discussions regarding a possible corporate transaction between the two companies.

During most of March 2010 American's internal attention was devoted to preparing for the closing of the sale of its Powder River Basin properties to Chesapeake Energy. The sale closed on March 31, 2010.

On April 6, 2010, Mr. Jones, Mr. Lenney, Mr. Pharr and Scott Sollee, Bakken Project Manager, of Hess met with Mr. O'Brien, Mr. Calerich, Mr. Loeffler, Mr. Lowrey, Mr. Solomon, Mr. Tholstrom, Mr. Schroeder and Ms. Beeman of American to discuss lease expirations and geology in the Goliath project area.

On June 8, 2010, Mr. Pharr of Hess called Mr. O'Brien of American and informed him that Hess' senior management was seriously evaluating a possible merger with American. Mr. Pharr told Mr. O'Brien that a merger proposal would be presented to senior management of Hess at a meeting in New York in approximately one week. On June 15, 2010, Mr. Jones contacted Mr. O'Brien to inform him that Hess senior management would generate and deliver to Mr. O'Brien a transaction proposal for American to consider. At a previously scheduled meeting of American's board of directors held on June 15, 2010 following American's annual meeting of stockholders, Mr. O'Brien informed American's board of directors that Hess was continuing to evaluate American, and that Mr. Jones had advised Mr. O'Brien to expect a proposal for American to consider.

On June 18, 2010, Mr. Jones contacted Mr. O'Brien to discuss the status of Hess' due diligence review of American. During this discussion, Mr. Jones indicated that Hess was interested in pursuing a merger with American in which American stockholders would receive common stock of Hess as the merger consideration. Mr. Jones informed Mr. O'Brien that Hess' board of directors had authorized Hess' senior management to proceed to negotiate

the transaction. Mr. Jones requested that American execute an exclusivity agreement pursuant to which Hess would have the exclusive right for a two week period to complete its due diligence. Mr. Jones informed Mr. O'Brien that Hess would send American a non-binding letter of intent in the next few days describing the proposed transaction. Mr. Jones also suggested that Hess was willing to pay a reasonable premium over and above the then-current American stock price, but he did not disclose a particular view on value. Mr. Jones followed up the telephone call by delivering to Mr. O'Brien a draft exclusivity letter on June 21, 2010.

On June 22, 2010, American's board of directors held a special meeting to consider Hess' request for an exclusivity period pursuant to the draft exclusivity letter delivered by Hess. During this meeting American's board of directors determined that a merger with Hess was worthy of consideration and evaluation. American's board of directors also reviewed the exclusivity agreement prepared by Hess, and determined that it was generally supportive of such a short term exclusivity period. American's board of directors objected, however, to a provision that precluded American from continuing to provide information to other companies with whom American was already communicating, assisting with valuation and supporting due diligence. Accordingly, American's board of directors authorized management to execute an exclusivity agreement, so long as the agreement permitted American to continue its existing discussions and information sharing with other parties while simultaneously continuing discussions with Hess. Also at this meeting, American's board of directors authorized management to identify and interview investment banking firms to assist the board in evaluating any potential transaction that might be proposed by Hess. American's board of directors determined not to form a special committee because, unlike the proposed transaction with Company A, it was not contemplated that any executive officers of American would enter into new employment agreements with Hess or the surviving corporation after the merger and there was no other potential conflict of interest with the interests of stockholders generally. Later that day, American executed an exclusivity agreement with Hess, which provided that, for a two week period, American would not knowingly initiate or solicit certain change of control or similar transactions with a party other than Hess, or initiate or participate in substantive negotiations with any third party regarding such a transaction with a party other than Hess, or enter into an agreement that could reasonably be expected to lead to such a transaction, while Hess performed additional due diligence. The exclusivity agreement, however, did not preclude American from continuing to provide information regarding American to other interested parties. The term of the exclusivity agreement expired on July 6, 2010.

On June 28, 2010, seven Hess representatives, including Mr. Jones, travelled to American's headquarters to conduct further legal and business due diligence investigations of American, focusing on the operations and assets of American, as well as the proposed valuations of American's undeveloped oil and gas properties in the Bakken region and financial, land, engineering, geology and legal issues. Mr. Jones stayed in Denver to meet with American management on June 29, 2010, to discuss Hess' evaluation of American, the respective positions, responsibilities and duties of certain officers and employees of American and personnel who might be important to Hess in a transition process.

On July 6, 2010, Mr. Jones returned to American's offices and met with Mr. O'Brien, Mr. Calerich and Mr. Tholstrom. Mr. Jones presented American with a written proposal for a merger transaction between Hess and American, which proposal was subject to further confirmatory due diligence and the negotiation and execution of a definitive agreement and plan of merger. The proposal contemplated a merger of Hess and American pursuant to which Hess would issue to the holders of American common stock 8,500,000 shares of Hess common stock in exchange for all of the outstanding shares of American common stock. The proposal also contemplated the potential payment of a cash dividend to American stockholders, based on American's working capital and available cash at closing. Hess included the dividend proposal to respond to American's expressed desire to reflect in the merger consideration the value of American's positive working capital, if any.

On July 7, 2010, American's board of directors met in a special meeting together with its legal advisor, Patton Boggs LLP, to consider Hess' July 6 proposal. American's board of directors discussed the transaction proposed by Hess focusing on the share consideration proposed by Hess and noting that it represented a 14% premium to the closing American stock price on July 6. American's board of directors noted that, despite all the efforts undertaken by Mr. O'Brien and American's management during late 2009 and early 2010, the Hess proposal was the only concrete proposal that American had received for a strategic business combination transaction and the valuation proposed was higher than any valuation parameters previously discussed with any other party, as no other party had proposed paying a premium over American's stock price. Mr. O'Brien informed American's board of directors that

of the eleven companies that had been evaluating American data only two of the companies still had not communicated a definitive decision to American. American's board of directors determined to pursue the proposed transaction as outlined in the proposal letter but directed Mr. O'Brien to make a counter-proposal in which the consideration to be paid by Hess would be equivalent to at least $8.00 per share of American common stock. The $8.00 per share figure was slightly higher than the all time high price of American's stock. On July 8, 2010, Mr. O'Brien delivered an email message to Mr. Jones suggesting that the Hess proposal be revised to account for the then current cash balance on American's books which could be reflected as an increase in the number of Hess shares to be delivered to American stockholders from 8,500,000 to approximately 9,200,000. On July 9, 2010, Hess sent a revised written proposal letter which increased the proposed Hess stock consideration to 8,600,000 shares, which represented a valuation of approximately $7.40 per share of American common stock. The proposal by its terms would expire at 5:00 p.m. New York time on July 9, 2010 unless American agreed to extend the exclusivity period through July 30, 2010 while the parties negotiated definitive transaction documentation. If American executed the revised exclusivity agreement, Hess' proposal would expire on July 30, 2010.

American's board of directors held a special meeting on July 9, 2010 to discuss Hess' revised July 9 proposal. During this meeting, American's board of directors determined that Hess' proposal to issue 8,600,000 shares of Hess common stock in exchange for all of the outstanding shares of American common stock (which as of July 9, 2010 was 62,877,732 shares on a fully-diluted basis), based on the $54.10 closing price of Hess common stock on July 8, 2010, represented an aggregate consideration to American stockholders of $465,260,000 (not taking into consideration the potential for a cash dividend based on American's working capital and available cash at closing) and consideration per share of American common stock equal to $7.40 per share, which represented a 15.4% premium over the $6.41 closing price of American common stock on July 8, 2010. The new exclusivity agreement required by Hess extended the exclusivity period to July 30, 2010 and required that American cease any existing activities, discussions or negotiations with other third parties regarding potential change of control or similar transactions. Mr. O'Brien informed American's board of directors that the two companies that had shown an interest in a possible transaction with American were no longer interested in pursuing a merger because their internal valuation of American was less than American's market capitalization at that time. In light of the improved proposal from Hess, the absence of any other proposal for a similar transaction from any other party and its belief that acceptable terms for a definitive transaction agreement could be negotiated with Hess, American's board of directors directed Mr. O'Brien to inform Mr. Jones that American would enter into the exclusivity agreement, but had not yet approved the terms of Hess' July 9 proposal. At this meeting American's board of directors determined to obtain a written proposal for an engagement letter from Tudor Pickering regarding the potential delivery by Tudor Pickering to American's board of directors of an opinion regarding the fairness, from a financial point of view, of the consideration to be received by American's stockholders in the transaction. American selected Tudor Pickering because of Tudor Pickering's expertise, reputation and familiarity with the oil and gas industry and because its investment banking professionals have substantial experience with comparable transactions. Tudor Pickering did not have any relationships with American or Hess during the preceding two years and did not otherwise have any conflicts of interest of which American was aware. The Board determined to engage Tudor Pickering for this limited engagement to ensure that it could avail itself of relevant financial support in an efficient manner that did not unduly burden American with unnecessary transaction costs. Mr. O'Brien called Mr. Jones on July 9, 2010 to inform him that American's board of directors had agreed to the exclusivity agreement, but not the proposed merger terms. Additionally, as required by Hess, on July 9, 2010, Hess and American entered into a new exclusivity agreement granting Hess the exclusive right to negotiate a definitive agreement for a strategic transaction with American through July 30, 2010. Hess and its advisors then began preparing a draft agreement and plan of merger based primarily on the terms in Hess' July 9 proposal.

Hess continued its due diligence review of American, with its representatives making additional visits to American's offices in Denver during the weeks of July 11 and July 18, 2010.

On July 16, 2010, Hess' outside legal counsel provided a draft agreement and plan of merger to American's outside legal counsel. The proposed agreement and plan of merger also included a provision requiring that certain significant stockholders of American would enter into voting and lockup agreements in support of the transaction. Hess, American and their respective legal counsels negotiated the terms of the agreement and plan of merger while Hess' and American's due diligence investigations continued.

On July 20, 2010, American's board of directors held a special meeting to discuss, together with its legal counsel, the due diligence process with Hess, the initial draft of the agreement and plan of merger and the need to retain a financial advisor to evaluate the fairness from a financial point of view of the proposed merger consideration and render an opinion to that effect. During a portion of this meeting, representatives of Tudor Pickering joined by telephone to discuss the process used by their firm to provide fairness opinions and the terms of the engagement letter that they had presented to American on July 19, 2010. American's board of directors determined to engage Tudor Pickering solely to provide American's board with a potential fairness opinion related to the proposed transaction pursuant to the terms of the engagement letter with Tudor Pickering dated July 19, 2010.

On July 20, 2010, Hess provided American with a draft of the form of voting and lockup agreement to be signed by significant stockholders of American. The voting and lockup agreement provided that each such stockholder would vote his shares of American common stock in favor of the approval and adoption of the agreement and plan of merger and against alternative transactions and would not sell or transfer his shares. The voting and lockup agreements would terminate 18 months following the termination of the agreement and plan of merger.

On July 21, 2010, Hess and American executed a mutual confidentiality agreement to enable American and its advisors to receive access to certain confidential information regarding Hess necessary for American's evaluation of the proposed transaction and to conduct its due diligence investigation with respect to Hess' business and legal, tax, regulatory and other matters.

On July 21, 2010, American sent a revised version of the agreement and plan of merger based on discussions between American's advisors, senior management and board of directors. The significant revisions requested by American included: expansion of Hess' representations; provisions which would allow American to incur indebtedness in the period between signing the agreement and closing the transaction and to make additional capital expenditures; relaxation of some of the restrictions on American's ability to solicit alternative transaction proposals or engage in discussions related to such an alternative transaction proposal; a significant reduction in the termination fee and expense reimbursement payable if the agreement and plan of merger were to be terminated in certain circumstances; and a reduction in the amount of time Hess would have to try to match any superior transaction proposal that emerges. Hess had initially proposed a 5% termination fee and unlimited expense reimbursement if the agreement and plan of merger was terminated in certain circumstances; American rejected that and proposed a reduction to a 2% termination fee and a cap on expense reimbursement at 0.5% of the merger consideration. Additionally, the revised draft indicated that American wanted further discussion regarding the potential cash dividend payable to its stockholders and the merger consideration.

On July 22, 2010, representatives of Hess held a telephone call with representatives of American to negotiate the terms of the agreement and plan of merger. In particular, the provisions in the agreement and plan of merger regarding (i) how to measure working capital for the purpose of the potential special dividend, (ii) the amount of the termination fee and a cap on expense reimbursement payable by American to Hess and the circumstances in which American would be obligated to pay such fee and reimbursement and (iii) the requirement that American use its commercially reasonable efforts to sell certain properties were discussed. The parties also discussed whether the merger consideration would be reflected in the agreement and plan of merger as a fixed exchange ratio designed to approximate the 8.6 million shares that Hess had proposed as the transaction consideration. During these negotiations, the representatives of American emphasized that in light of the timing to complete the merger, and American's ongoing exploration and development activities and related capital needs, it was important to American that Hess provide interim financing for such activities in connection with the agreement and plan of merger or allow American to obtain such financing independently.

On July 23, 2010, American's board of directors and its legal advisors held a special meeting to discuss the agreement and plan of merger following the discussion among the legal representatives of Hess and American the previous day. At this meeting, Tudor Pickering presented American's board of directors with a financial analysis of the total consideration to be received by American stockholders in the transaction. American's board of directors also discussed Hess' requirement for the voting and lockup agreements. American subsequently delivered a revised draft of the form of voting and lockup agreement which reflected American's objection to the provision whereby the

voting and lockup agreements would survive for 18 months following the termination of the agreement and plan of merger.

Later that day, Hess delivered to American and its representatives its proposed revised draft of the agreement and plan of merger. The revised draft included the expanded Hess representations that were requested and reduced Hess' proposed termination fee from 5% to 3.5% and capped expense reimbursement at the requested 0.5%. It also reduced the amount of time for Hess to try to match a superior transaction proposal. The revised agreement and plan of merger also referenced the fact that Hess would provide an interim working capital financing facility. A term sheet for such a facility in the amount of $25 million was sent to American's representatives contemporaneously with the delivery of the revised agreement and plan of merger. The revised draft of the agreement and plan of merger and the term sheet for the interim financing facility made it clear that the facility would have to be repaid if the agreement and plan of merger were terminated.

On July 24, 2010, American delivered to Hess its draft disclosure letter, which contained disclosures related to American's representations and warranties in the agreement and plan of merger. The disclosures included information regarding American's subsidiaries, outstanding equity awards, including stock options, restricted stock and warrants, beneficial owners of American common stock, transactions with affiliates, history of SEC comment letters, the absence of pending litigation, the current status of American's business, environmental matters, certain contracts, American's employee benefit plans, real property leases, and oil and gas well drilling and production. and Hess reviewed this document over the weekend of July 24/25 and determined that none of the disclosures in the letter materially affected Hess' conclusions from its diligence review. Additionally, American delivered comments to the interim financing term sheet and indicated that American would require not only a term sheet for the interim financing but a firm commitment from Hess in the amount of $30 million. Representatives from Hess and American had a further telephonic negotiation on July 25, 2010 with respect to the credit facility, voting and lockup agreements and agreement and plan of merger. Among other things discussed, American's counsel indicated that American's board of directors was still concerned that the termination fee was too high. Additionally, American's counsel asserted that the definition of working capital for purposes of the potential special dividend should give credit to American for certain land acquisition costs and potentially other costs that would be incurred and that would otherwise reduce cash available for the special dividend. On July 25, 2010, Mr. Louis Jones and Mr. Pat O'Brien discussed the working capital issue and agreed to credit certain land acquisition costs but not make any additional changes.

On July 26, 2010, Hess delivered to American a draft commitment letter and a revised draft term sheet for a short-term revolving credit facility in the amount of $30 million. Representatives of Hess also indicated that Hess was willing to reduce the termination fee to 3% as a final compromise on the termination fee, which was calculated to equal $13.5 million. Expense reimbursement remained capped at 0.5%, which was calculated to equal $2.25 million. Hess' board of directors approved the proposed transaction with American subject to final negotiations, and later that day, Hess delivered to American a proposed final version of the agreement and plan of merger, which incorporated all of the revisions previously agreed upon by respective legal counsel for American and Hess. Prior to receiving a revised draft of the agreement and plan of merger and as the respective legal counsels continued to negotiate the commitment letter for the financing and the voting and lockup agreements, American's board of directors held a meeting on July 26, 2010 to discuss the status of the negotiations. At this meeting, American's board of directors also received from Tudor Pickering an updated analysis. Subsequently, the agreement and plan of merger was finalized, as were the commitment letter for the interim financing and the voting and lockup agreements.

American's board of directors held another meeting on July 27, 2010 at which Patton Boggs LLP, its outside legal counsel, presented a copy of the final draft of the agreement and plan of merger, the voting and lockup agreements and the financing commitment letter to American's board of directors. After responding to questions from members of American's board of directors on the agreement and plan of merger, American's outside counsel discussed the terms of the proposed agreements. At this meeting, Tudor Pickering presented its financial analysis with respect to the potential transaction and answered questions from American's board of directors. Tudor Pickering verbally rendered its opinion that, as of July 27, 2010, the total consideration (including the potential special dividend, if any) provided in the agreement and plan of merger was fair to the holders of American common stock from a financial point of view. This opinion was subsequently confirmed in writing as of the same date and is

attached hereto as Appendix C. Also at this meeting, Patton Boggs LLP discussed with American's directors the legal standards applicable to its decision to approve the agreement and plan of merger and the transactions contemplated thereby. In particular, American's directors reviewed their duties of care and loyalty, to act in good faith and in the best interests of shareholders as a whole and to reasonably inform themselves of relevant factors before making a decision. Senior management of American, and American's board of directors, reviewed the terms of the proposed agreement and plan of merger. American's board of directors concluded that the proposed transaction with Hess was in the best interests of American and its stockholders, and recommended that American stockholders approve the merger and the agreement and plan of merger. After further discussion among the members of American's board of directors and consideration of the factors described under "American's Reasons for the Merger," American's board of directors voted unanimously to approve the agreement and plan of merger and the transactions contemplated thereby as being in the best interests of the stockholders of American. American's board of directors authorized senior management to execute the agreement and plan of merger and the financing commitment letter. In the evening of July 27, 2010, Hess, Merger Sub and American executed the agreement and plan of merger and the commitment letter, and Hess and American issued a joint press release publicly announcing the transaction. In addition, on July 27, 2010, the voting and lockup agreements were executed by the stockholders party thereto and by Hess. On July 29, 2010, American filed a Report on Form 8-K with the Securities and Exchange Commission announcing that the agreement and plan of merger had been signed.

### Hess' Reasons for the Merger

Hess' board of directors believes that the merger is in the best interest of Hess and its stockholders and approved the agreement and plan of merger after it consulted with Hess' senior management with respect to strategic and operational matters and with its legal advisors with respect to the agreement and plan of merger and related issues. In making its determinations regarding the merger, Hess' board of directors discussed a number of factors, including:

- The increase of Hess' strategic acreage position in the Bakken shale region in North Dakota by approximately 85,000 net acres, which will build upon Hess' current net acreage position in the Bakken shale region of approximately 642,000 acres, leverage Hess' nearby infrastructure and lean manufacturing techniques and enhance Hess' growth profile in the Bakken shale region.

- The compatibility of American's business with Hess' existing position in the Bakken shale region and Hess' strategic emphasis on expanding unconventional oil and gas exploration and production opportunities.

- American's prospects and business, including American's potential oil and gas reserves, potential production volumes, potential cash flows from operations, recent trading prices for both Hess and American common stock and the ratio of Hess' common stock price to American's common stock price over various periods, as well as current industry, economic and market conditions.

- The effect of the merger on Hess stockholders, including potential dilution of Hess stockholders. Because Hess will be issuing new shares of common stock to American stockholders in the merger, each outstanding share of Hess common stock immediately prior to the merger will represent a smaller percentage of Hess' total shares of common stock after the merger.

In view of the wide variety of factors considered in connection with its evaluation of the merger, Hess' board of directors did not consider it practicable to, and did not attempt to, quantify or otherwise assign relative weights to the specific factors it considered in reaching its determination. Hess' board of directors viewed its position and recommendations as being based on all of the information and the factors presented to and considered by it. In addition, individual directors may have given different weights to different information and factors.

### American's Reasons for the Merger

American's board of directors has unanimously approved and adopted the agreement and plan of merger and determined that the agreement and plan of merger and the strategic business combination contemplated thereby are advisable and in the best interests of American stockholders. In the course of reaching its decision to approve the agreement and plan of merger, American's board of directors consulted with American's financial and legal

advisors and considered a number of factors that it believed supported its decision. The material factors in support of its decision are set forth below.

- The current and historical prices of American's common stock and the fact that the per share merger consideration of 0.1373 shares of Hess common stock, based on the closing price of shares of Hess common stock on July 27, 2010, represents a premium of approximately:

  - 9.4% over the closing price of $6.69 per share of American's common stock on July 27, 2010, the last trading day before the public announcement the merger; and

  - 14.2% over the closing price of American's common stock on July 9, 2010, the date of the written proposal received from Hess.

- American's board of directors believed that the value received, approximately $5,000 per net acre (based on the cash-free equity value of the transaction), is at the high end of per acre valuations within American's area of focus based on results from the May 5, 2010 State of North Dakota lease sale, which was the most recent publicly available measurement for acreage valuation, where American paid $2,600 to $5,600 per acre for state oil and gas mineral leases.

- American's board of directors considered the business, financial condition, results of operations, prospects and competitive position of American, the prospects for American's continued growth and future profit-ability and the challenges in achieving such growth and profitability, particularly the need to finance continued exploration and development activities and the risk that either equity or debt financing could be dilutive or unavailable on terms advantageous to American.

- American's board of directors believes that the merger is more favorable to American's stockholders than continuing to operate American as an independent company because of the uncertain returns to such stockholders in light of American's business, operations, financial condition, strategy and prospects. American's board of directors recognized, in particular, that American would continue to face significant challenges in executing its strategy of focusing on the development of its acreage position in the Williston Basin of North Dakota. American's board of directors concluded that, because of Hess' financial strength and operational resources, experience drilling in the Williston Basin and relationships with service companies in the exploration and production industry in the Williston Basin, a merger with Hess would improve American's ability to capitalize on its production and development opportunities. In particular, American's board of directors recognized the following challenges in continuing to execute American's strategy which a merger with Hess could help address:

  - it can be difficult for a smaller producer such as American to secure crews and equipment to complete well drilling activities which can result in significant delays in bringing new wells into production;

  - the costs of drilling and completing new wells, and arranging for related services, has been increasing significantly during the past six months;

  - there is limited capacity in the Williston Basin for transporting hydrocarbons from the wells to processing facilities and that capacity and better pricing terms are generally more readily available to larger oil and gas producers;

  - installing infrastructure to facilitate natural gas sales and water disposal requires significant lead time and financial investment;

  - American has a limited history of production from the Bakken formation, which results in greater uncertainty regarding the production life of its wells and greater risk that drilling activities will not be commercially viable;

  - American must aggressively expand its drilling program to establish production in mineral leases that might otherwise expire;

  - American has experienced continually increasing oil and gas property lease costs during the past six months;

- American is transforming its operational focus from acreage administration to managing oil and gas drilling and production activities, which requires American to hire skilled operational personnel and expand its administrative staff.

- Hess has a significant position in, and a long term commitment to, the Williston Basin and has published its plan to invest about $1 billion per year over the next five years.

- The complementary nature of the two companies' positions in the Williston Basin will enhance the prospects for the combined company to achieve competitive advantages in its production and development opportunities.

- The much larger market capitalization of Hess and greater ability of Hess to access capital markets will likely enhance the ability to finance exploration and development of American's acreage position.

- Hess has committed to provide a senior secured revolving credit facility of $30.0 million on terms that are more favorable to American than would otherwise be available to American in the market, including the absence of financial covenants and fees so long as the agreement and plan of merger has not been terminated. This financing is important so that American can continue to finance its planned exploration and production activities and other working capital needs through the effective date of the merger.

- American's board of directors expects the merger to be treated as a reorganization within the meaning of Section 368(a) of the Internal Revenue Code, so that U.S. holders (as defined herein) of American common stock generally will not recognize gain or loss on the receipt of Hess common stock in exchange for American common stock in the merger, except with respect to cash received in lieu of fractional shares of Hess common stock or the potential special cash dividend described in the section entitled "— Special Dividend."

- Through their receipt of shares of Hess common stock as the merger consideration, American stockholders will have the opportunity to participate in Hess' growth and income in the future (including those opportunities related to American's business), should they determine to retain their Hess shares following the merger. American's board of directors also considered that receiving shares of Hess common stock would provide liquidity for those American stockholders who do not want to hold Hess stock and seek to sell their Hess stock after the merger.

- American stockholders who continue to hold Hess common stock following the merger will have an investment in a much larger and integrated energy company with more diversified businesses which may be subject to less financial and business risk than American.

- The price proposed by Hess and the agreement and plan of merger reflect arm's-length negotiations between the parties and represents the highest total value that American had been offered for the acquisition of American.

- American's management has devoted considerable time in evaluating the potential for joint venture participations in American's Williston Basin acreage position. As part of its efforts to evaluate such opportunities, American has engaged in discussions with several companies in 2009 and early 2010 about strategic transactions involving American including the acquisition of or merger with American. None of the companies with whom such discussions took place indicated that they would be prepared to support a valuation for American on the terms offered by Hess.

- American's board of directors considered all the terms and conditions of the agreement and plan of merger, including:

  - the limited conditions to the completion of the merger, including that such completion will not require any filings or approvals with respect to the antitrust laws of the United States or of any other jurisdiction and the absence of a financing condition;

  - the exchange ratio in the merger is fixed so that American stockholders will have the opportunity to benefit from any increase in the trading price of Hess' common stock between the announcement of the agreement and plan of merger and completion of the merger;

- the possibility that American can declare a special cash dividend prior to the completion of the merger payable by the surviving company in the merger to American stockholders in an aggregate amount equal to American's positive working capital (as determined in accordance with the agreement and plan of merger) to the extent of any cash on hand;

- the provisions that allow American to engage in negotiations with, and provide information to, third parties in response to unsolicited, bona fide, written acquisition proposals from such third parties;

- the provisions that allow American to terminate the agreement prior to the receipt of American stockholder approval of the merger to enter into a written agreement to effectuate a superior proposal; and

- the ability of American to specifically enforce Hess' obligations under the agreement and plan of merger.

- The agreement and plan of merger requires the approval of the holders of at least a majority of American's common stock.

- American's board of directors considered the terms of the voting and lockup agreements, in particular, the fact that they terminate upon a termination of the agreement and plan of merger.

- Tudor Pickering rendered its opinion, dated July 27, 2010, to American's board of directors as to the fairness as of such date, from a financial point of view, of the merger consideration and special dividend (if any), collectively, to the holders of American's common stock, based upon and subject to the factors and assumptions, limitations, qualifications and other matters set forth in Tudor Pickering's written opinion. See "— Opinion of American's Financial Advisor" beginning on page 40 and **Appendix C** — Opinion of Tudor, Pickering, Holt & Co. Securities Inc. American stockholders are urged to read the Tudor Pickering opinion carefully and in its entirety.

American's board of directors also considered a variety of risks and other potential negative factors concerning the agreement and plan of merger, the merger and the transactions contemplated thereby. The material negative factors considered by American's board of directors are set forth below.

- American stockholders will not directly participate in any future earnings or growth of American as American will no longer exist as an independent, publicly traded company. Instead, American stockholders will have only a relatively small equity position in Hess which could be diluted in the future and will not directly reflect the value of American's business and operations.

- Under the terms of the agreement and plan of merger, (i) American may not solicit other takeover proposals and (ii) American, in certain circumstances, may be required to pay Hess a $13.5 million termination fee, reimburse up to $2.25 million in Hess' expenses and pay all principal, accrued interest and any other amounts owing under the senior secured revolving credit facility to be provided by Hess to American if the agreement and plan of merger is terminated.

- The agreement and plan of merger contains restrictions on the conduct of American's business prior to the completion of the merger.

- There can be no assurance that all conditions to the parties' obligations to consummate the merger will be satisfied and, as a result, it is possible that the merger may not be completed even if approved by American stockholders.

- The exchange ratio in the merger is fixed so that American stockholders will have the risk of any decrease in the trading price of Hess' common stock between the announcement of the agreement and plan of merger and completion of the merger.

- The transaction costs, including costs of potential litigation, arising from the agreement and plan of merger, are significant to a company the size of American.

- American's business plan for 2010 includes drilling activities and lease acquisitions that will require cash in excess of that which American expects to have on hand. If the merger is not completed and American seeks

additional financing, market and other conditions may not be favorable and American may suffer adverse consequences from a delay in seeking such financing.

- There are risks and costs associated with the merger not being completed in a timely manner or at all, including the diversion of management and employee attention, potential employee attrition, the potential effect on business and customer relationships and potential litigation arising from the agreement and plan of merger or the transactions contemplated thereby.

- There is uncertainty about whether a higher purchase price could be attained if a sale of American were postponed, including the uncertainty as to whether American's operating performance at such a time would justify a higher purchase price.

- American's board of directors and executive officers have financial interests in the merger that are in addition to and/or differ from the interests of American's stockholders.

- Under Nevada law, American stockholders are not entitled to appraisal or dissenters' rights or similar rights to a court valuation of the fair value of their shares.

- There are various other applicable risks associated with American and the merger, including those described under the section entitled "Risk Factors" beginning on page 17.

The foregoing discussion of the factors considered by American's board of directors is not exhaustive but American believes it includes the material factors considered by American's board of directors in its consideration of the merger, the agreement and plan of merger and the transactions contemplated thereby. After considering these factors, American's board of directors concluded that the considerations in favor of the merger, the agreement and plan of merger and the transactions contemplated thereby outweighed the negative factors. In view of the wide variety of factors considered, American's board of directors did not find it practicable to quantify or otherwise assign relative weights to the foregoing factors. In addition, individual directors may have assigned different weights to various factors. American's board of directors unanimously approved and adopted the agreement and plan of merger and determined the agreement and plan of merger and the strategic business combination contemplated thereby to be in the best interests of American stockholders and recommends that the stockholders approve the agreement and plan of merger based upon the totality of the information presented to and considered by it.

**Opinion of American's Financial Advisor**

American retained Tudor Pickering solely to provide an opinion to American's board of directors in connection with the merger. American instructed Tudor Pickering to evaluate the fairness, from a financial point of view, of the merger consideration and special dividend, if any, referred to collectively as the total consideration, to be paid to the holders of American common stock in the merger (other than shares held by American, Hess, Merger Sub or any of their affiliates). At a meeting of American's board of directors held on July 27, 2010, Tudor Pickering rendered its opinion orally to American's board of directors that, as of July 27, 2010, based upon and subject to the factors and assumptions set forth in the opinion and based upon such other matters as Tudor Pickering considered relevant, the total consideration to be paid to the holders of American common stock pursuant to the agreement and plan of merger was fair from a financial point of view to such holders. Upon execution of the agreement and plan of merger on July 27, 2010, Tudor Pickering confirmed its opinion in writing to American's board of directors.

The opinion speaks only as of the date it was delivered and not as of the time the merger will be completed. The opinion does not reflect changes that may occur or may have occurred after July 27, 2010, which could significantly alter the value of American or Hess or the respective trading prices of their common stock, which are factors on which Tudor Pickering's opinion was based.

**The full text of the Tudor Pickering opinion, dated July 27, 2010, which sets forth, among other things, the assumptions made, procedures followed, matters considered, and qualifications and limitations of the review undertaken by Tudor Pickering in rendering its opinion, is attached hereto as Appendix C and is incorporated herein by reference. The summary of the Tudor Pickering opinion set forth in this document is qualified in its entirety by reference to the full text of the opinion. American stockholders are urged to read**

**the Tudor Pickering opinion carefully and in its entirety. Tudor Pickering provided its opinion for the information and assistance of American's board of directors in connection with its consideration of the merger. The Tudor Pickering opinion does not constitute a recommendation as to how any holder of interests in American should vote or act with respect to the merger or any other matter.**

Tudor Pickering's opinion and its presentation to American's board of directors were among many factors taken into consideration by American's board of directors in approving the agreement and plan of merger and making its recommendation regarding the merger.

In connection with rendering its opinion and performing its related financial analysis, Tudor Pickering reviewed, among other things:

- the agreement and plan of merger;

- annual reports to stockholders and Annual Reports on Form 10-K of American for the three years ended December 31, 2009;

- annual reports to stockholders and Annual Reports on Form 10-K of Hess for the three years ended December 31, 2009;

- certain interim reports to stockholders and Quarterly Reports on Form 10-Q of American and Hess;

- certain other communications from American and Hess to their respective stockholders;

- the estimated proved reserves of American as of December 31, 2009 prepared by Ryder Scott Company L.P., which were discussed with the senior management of American;

- the estimated proved reserves of American effective April 1, 2010 prepared by management of American, which were discussed with the senior management of American;

- the estimated future production and cash flows associated with the producing assets and undeveloped inventory of American effective July 1, 2010, which were discussed with the senior management of American;

- certain internal financial information and forecasts for American prepared by the management of American; and

- certain publicly available research analyst reports with respect to the future financial performance of American and Hess, which were discussed with the senior managements of American and Hess.

Tudor Pickering also held discussions with members of the senior managements of American and Hess regarding their assessment of the strategic rationale for, and the potential benefits of, the merger and the past and current business operations, financial condition and future prospects of their respective entities. In addition, Tudor Pickering reviewed the reported price and trading activity for the American common stock and Hess common stock, compared certain financial and stock market information for American and Hess with similar information for certain other companies the securities of which are publicly traded, reviewed the financial terms of certain recent business combinations in the oil and natural gas exploration, development and production industry specifically and in other industries generally and performed such other studies and analyses, and considered such other factors, as it considered appropriate.

For purposes of its opinion, Tudor Pickering assumed and relied upon the accuracy and completeness of all of the financial, accounting, legal, tax and other information provided to, discussed with or reviewed by or for it, or publicly available, and did not independently verify such information. Furthermore, Tudor Pickering relied upon the assurances of the senior management of American that they were not aware of any facts or circumstances that would make such information inaccurate or misleading. In that regard, Tudor Pickering assumed with American's consent that (i) the internal financial information and forecasts referenced above (including the forecasted amount of working capital which will be paid to holders of the American common stock as the special dividend discussed below) were reasonably prepared on a basis reflecting the best currently available estimates and good faith judgments of American, and that such forecasts will be realized in the amounts and the time periods contemplated thereby, (ii) the publicly available research analyst reports of Hess were a reasonable basis upon which to evaluate

the future financial performance of Hess and that Hess will perform substantially in accordance with such projections, and (iii) the estimated proved reserves of American as of December 31, 2009 prepared by Ryder Scott Company L.P., the estimated proved reserves of American effective April 1, 2010 prepared by management of American and the estimated future production and cash flows associated with the producing assets and undeveloped inventory of American effective July 1, 2010 were a reasonable basis upon which to evaluate the proved reserve levels and non-proved resource levels of American. Tudor Pickering also assumed the accuracy of the representations and warranties contained in the agreement and plan of merger and all agreements related thereto and that the transactions contemplated by the agreement and plan of merger will be consummated in accordance with the terms of the agreement and plan of merger without waiver, modification or amendment of any material term, condition or agreement and that, in the course of obtaining the necessary governmental, regulatory or other consents, approvals, releases and waivers, no delay, limitation, restriction or condition will be imposed that would have a material adverse effect on American, Hess, Hess Investment Corp., the holders of American common stock or the expected benefits of the transactions contemplated by the agreement and plan of merger in any way meaningful to its analysis. In addition, Tudor Pickering did not conduct a physical inspection of the properties and facilities of American or any of its subsidiaries or Hess or any of its subsidiaries and did not make or obtain an independent evaluation or appraisal of the assets and liabilities (including any contingent, derivative or off-balance-sheet assets and liabilities) of American or any of its subsidiaries or Hess or any of its subsidiaries and was not furnished with any such evaluation or appraisal. Tudor Pickering's opinion does not address any legal, regulatory, tax or accounting matters.

Tudor Pickering's opinion is necessarily based upon economic, monetary, market and other conditions as in effect on, and the information made available to it as of, July 27, 2010. Tudor Pickering has disclaimed any obligation to update, revise or reaffirm its opinion based on circumstances, developments or events occurring after the date of its opinion.

The estimates contained in Tudor Pickering's analysis and the results from any particular analysis are not necessarily indicative of future results, which may be significantly more or less favorable than suggested by such analyses. In addition, analyses relating to the value of businesses or assets neither purport to be appraisals nor do they necessarily reflect the prices at which businesses or assets may actually be sold. Accordingly, Tudor Pickering's analysis and estimates are inherently subject to substantial uncertainty.

The description set forth below constitutes a summary of the analyses employed and factors considered by Tudor Pickering in rendering its opinion to American's board of directors. The preparation of a fairness opinion is a complex, analytical process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances and is not necessarily susceptible to partial analysis or summary description. In arriving at its opinion, Tudor Pickering did not attribute any particular weight to any particular analysis or factor considered by it, but rather made qualitative judgments as to the significance and relevance of each analysis and factor. Several analytical methodologies were employed by Tudor Pickering in its analyses, and no one method of analysis should be regarded as critical to the overall conclusion reached by Tudor Pickering. Each analytical technique has inherent strengths and weaknesses, and the nature of the available information may further affect the value of particular techniques. Accordingly, Tudor Pickering believes that its analyses must be considered as a whole and that selecting portions of its analyses and of the factors considered by it, without considering all analyses and factors in their entirety, could create a misleading or incomplete view of the evaluation process underlying its opinion. The conclusion reached by Tudor Pickering, therefore, is based on the application of Tudor Pickering's own experience and judgment to all analyses and factors considered by Tudor Pickering, taken as a whole. Tudor Pickering's opinion was reviewed and approved by its fairness opinion committee.

No company or transaction used in the analyses of comparable transactions summarized below is identical or directly comparable to American, Hess or the merger. Accordingly, these analyses must take into account differences in the financial and operating characteristics of the selected publicly traded companies and differences in the structure and timing of the selected transactions and other factors that would affect the public trading value and acquisition value of the companies considered. The companies and transactions included in the comparisons summarized below were those deemed by Tudor Pickering to be relevant to such comparisons based on Tudor Pickering's judgment.

Tudor Pickering's opinion relates solely to the fairness, from a financial point of view, to the holders of the outstanding shares of American common stock (other than shares held by American, Hess, the surviving company or any of their affiliates) of the total consideration to be paid to such holders in the merger as contemplated by the agreement and plan of merger.

Tudor Pickering's opinion does not address the relative merits of the merger as compared to any alternative business transaction or strategic alternative that might be available to American, nor does it address the underlying business decision of American to engage in the merger. Tudor Pickering does not express any view on, and its opinion does not address, any other term or aspect of the agreement and plan of merger or the merger, including, without limitation, the fairness of the merger to, or any consideration received in connection therewith by, creditors or other constituencies of American or Hess, nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of American or Hess, or any class of such persons, in connection with the merger. Tudor Pickering has not been asked to consider, and its opinion does not address, the price at which Hess common stock will trade at any time. Tudor Pickering is not rendering any legal or accounting advice and understands American is relying on its legal counsel and accounting advisors as to legal and accounting matters in connection with the merger.

Tudor Pickering was not requested to, and did not, solicit indications of interest or proposals from third parties regarding a possible acquisition of all or any part of American or any alternative transaction. Tudor Pickering was not retained to, and it did not materially, participate in the negotiation of the terms of the agreement and plan of merger or the transactions contemplated thereby, nor was Tudor Pickering retained to, and it did not materially, provide any advice or services in connection with the agreement and plan of merger or the transactions contemplated thereby other than the delivery of its opinion. Tudor Pickering expresses no view or opinion as to any such matters and has assumed, with the consent of American, that the terms of the agreement and plan of merger are, from the perspective of American and its stockholders, the most beneficial that could be obtained.

The data and analyses summarized herein are from Tudor Pickering's presentation to American's board of directors delivered on July 27, 2010, which primarily utilized market closing prices as of July 26, 2010. The analyses summarized herein include information presented in tabular format. In order to fully understand the financial analyses performed, the tables must be read with the text of each summary. For purposes of its analysis, Tudor Pickering defined EBITDAX as net income plus income taxes, interest expense (less interest income), depreciation and amortization, and exploration expenses. Cash flow represents cash flow provided by operations before changes in working capital.

Tudor Pickering and its affiliates, as part of their investment banking business, are continually engaged in performing financial analyses with respect to businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and other transactions as well as for estate, corporate and other purposes. American selected Tudor Pickering to provide a fairness opinion in connection with the merger because of Tudor Pickering's expertise, reputation and familiarity with the oil and gas industry and because its investment banking professionals have substantial experience in transactions comparable to the merger.

Pursuant to its engagement letter with Tudor Pickering, American agreed to pay Tudor Pickering $1 million upon delivery of its opinion. The engagement letter also provides for additional fees contingent upon the consummation of the merger, equal to $500,000 payable upon consummation of the merger. The amount and timing of the payment of the fees to Tudor Pickering was determined based on negotiations between American and Tudor Pickering, and the timing of the $500,000 payment on closing was made at the request of American as a means of controlling costs in case the merger was not completed. American has also agreed to reimburse Tudor Pickering for reasonable out-of-pocket expenses incurred by Tudor Pickering in performing its services, including reasonable fees and expenses of its legal counsel, and to indemnify Tudor Pickering against specific liabilities and expenses relating to or arising out of its engagement, including liabilities under the federal securities laws.

In the ordinary course of its business, Tudor Pickering and its affiliates may actively trade or hold the securities of American and Hess for its own account or for the account of its customers and, accordingly, may at any time hold a long or short position in such securities. In addition, Tudor Pickering and its affiliates and certain of its employees, including members of the team performing services in connection with the merger, as well as certain private equity

funds associated or affiliated with Tudor Pickering, in which they may have financial interests, may from time to time acquire, hold or make direct or indirect investments in or otherwise finance a wide variety of companies, including American and Hess, other prospective purchasers and their respective affiliates. Tudor Pickering and its affiliates may provide investment banking or other financial services to Hess or any of the other parties to the transaction or their respective stockholders, affiliates or portfolio companies in the future. In connection with such investment banking or other financial services, it may receive compensation.

### Summary of Tudor Pickering's Analysis

In the merger, holders of American common stock will receive 0.1373 shares of Hess common stock for each share of American common stock, which is referred to as the merger consideration. Additionally, the agreement and plan of merger provides for a possible cash dividend to holders of American common stock to the extent of American's positive working capital as of the closing date of the merger, subject to available cash, which is referred to as the special dividend. The merger consideration and the special dividend, if any, are collectively referred to in this section as the total consideration. Based on the last trading price of Hess common stock of $52.78 on July 26, 2010 and assuming no special dividend is payable pursuant to the terms of the agreement and plan of merger, the value of the total consideration to be received by American stockholders was $7.25 per share, and assuming a special dividend of $6.9 million in the aggregate, the value of the total consideration to be received by American stockholders was $7.36 per share. Tudor Pickering concluded that, as of July 27, 2010, based upon and subject to the factors and assumptions set forth in the opinion and based upon such other matters as Tudor Pickering considered relevant, the total consideration to be paid to the holders of American common stock pursuant to the agreement and plan of merger, including the special dividend if it is paid, was fair from a financial point of view to such holders.

### Commodity Price Assumptions

The annual commodity price assumptions used by Tudor Pickering in certain of its analyses are summarized below. Tudor Pickering used the applicable 2015 NYMEX Forward Strip prices for the periods after 2015 in its analyses that called for NYMEX Forward Strip prices in periods after 2015. Tudor Pickering used the applicable 2014 Wall Street Consensus prices for periods after 2014 that called for Wall Street Consensus prices in periods after 2014.

NYMEX Forward Strip as of July 26, 2010 ("Strip")

| Year | Gas (per MMBtu) | Oil (per Bbl) |
|------|-----------------|---------------|
| 2010 | $ 4.86 | $ 79.86 |
| 2011 | 5.20 | 82.61 |
| 2012 | 5.53 | 84.33 |
| 2013 | 5.72 | 85.14 |
| 2014 | 5.92 | 85.93 |
| 2015 | 6.16 | 87.04 |

Wall Street Research Consensus ("Consensus") (Source: Bloomberg)

| Year | Gas (per MMBtu) | Oil (per Bbl) |
|------|-----------------|---------------|
| 2010 | $ 5.75 | $ 82.80 |
| 2011 | 6.23 | 88.25 |
| 2012 | 6.50 | 96.00 |
| 2013 | 7.00 | 97.63 |
| 2014 | 7.10 | 88.38 |
| 2015 | 7.10 | 88.38 |

10 Year Historical Monthly Average ("10 Year Average")

| | Gas (per MMBtu) | Oil (per Bbl) |
|------|-----------------|---------------|
| Average (Rounded) | $6.00 | $55.00 |

### Select Public Company Trading Statistics Analysis

Tudor Pickering reviewed and compared certain financial, operating and stock market information of American to corresponding information of selected publicly traded companies with assets and operations deemed by Tudor Pickering to be most similar to American, which included Brigham Exploration Company, Kodiak Oil & Gas Corp., Oasis Petroleum Inc. and Northern Oil & Gas, Inc.

For the public trading analysis, select trading multiples were analyzed, including:

- enterprise value over proved reserves;

- enterprise value over Q1 2010 daily production;

- enterprise value over 2010E and 2011E production;

- enterprise value over 2010E and 2011E EBITDAX; and

- share price over 2010E and 2011E cash flow per share.

The enterprise value of each selected company was obtained by adding the market value of its common stock, its outstanding debt, and the book value of its preferred stock, minus its cash balance, as appropriate. Tudor Pickering utilized estimated future production, cash flow and EBITDAX for this analysis based on internal forecasts prepared by American management and on analyst consensus forecasts. The observed multiple ranges from the public trading analysis as compared to the resulting implied transaction range of multiples resulting from the proposed total consideration are summarized below. For purposes of the following table, total consideration was calculated based on the closing price of Hess common stock of $52.78 on July 26, 2010, multiplied by the exchange ratio of 0.1373, multiplied by the 62.6 million shares (based on the treasury stock method) of American common stock outstanding as of July 26, 2010, or $454 million.

| | Range | Median | Total Consideration (no Special Dividend) | Total Consideration ($6.9 Million Special Dividend) |
|---|---|---|---|---|
| **Ratio of Enterprise Value Over:** | | | | |
| Proved Reserves ($/Boe) . . . . . . . | $72.50 – $123.47 | $90.50 | $519.57 | $519.57 |
| Q1'2010 Production. . . . . . . . . . . ($/MBoe/d) | $367,248 – $554,926 | $407,437 | $2,710,950 | $2,710,950 |
| 2010E Production . . . . . . . . . . . . ($/MBoe/d) | $262,906 – $341,605 | $312,552 | $451,126 – $567,298 | $451,126 – $567,298 |
| 2011E Production . . . . . . . . . . . . ($/MBoe/d) | $111,303 – $178,187 | $145,642 | $157,855 – $189,099 | $157,855 – $189,099 |
| 2010E EBITDAX . . . . . . . . . . . . | 15.9x – 18.1x | 17.1x | 40.9x – 57.1x | 40.9x – 57.1x |
| 2011E EBITDAX . . . . . . . . . . . . | 7.0x – 7.7x | 7.1x | 9.5x – 10.0x | 9.5x – 10.0x |
| **Ratio Of Share Price Over:** | | | | |
| 2010E Cash Flow Per Share . . . . . | 17.7x – 18.8x | 18.1x | 40.9x – 53.7x | 41.5x – 54.5x |
| 2011E Cash Flow Per Share . . . . . | 6.8x – 8.8x | 7.2x | 9.5x – 10.4x | 9.7x – 10.6x |

Tudor Pickering noted that the observed ratios of enterprise value were identical whether or not the special dividend was included because the special dividend, if any, would be paid from American's cash balances and so it would not impact what Hess pays as merger consideration.

### Select Oil-Weighted Transaction Statistics Analysis

Tudor Pickering reviewed the 29 domestic oil-weighted transactions in the upstream energy industry of which Tudor Pickering was aware with the following criteria: (i) transaction value greater than or equal to $100 million, (ii) assets or target entity reserve base comprised of greater than 50% oil, predominantly onshore, and (iii) announced since January 1, 2009. Of these 29 transactions, 21 were asset sales, seven were corporate transactions, and one was a bankruptcy-related transaction. Three of these 29 transactions were also included in the

45

<u>Selected Corporate Transaction Statistics Analysis described below.</u> Tudor Pickering conducted a comparable transactions analysis to assess how similar transactions were valued.

For the comparable transactions analysis, select transaction multiples were analyzed including:

- the transaction value (defined as the equity purchase price plus assumed net debt obligations, if any) over proved reserves <u>(including both developed and undeveloped proved reserves)</u>; and

- the transaction value over daily production.

The observed multiple ranges from the comparable transaction analysis as compared to the resulting implied transaction multiples resulting from the proposed total consideration are summarized below. For purposes of the following table, total consideration was calculated based on the closing price of Hess common stock of $52.78 on July 26, 2010, multiplied by the exchange ratio of 0.1373, multiplied by the 62.6 million shares (based on the treasury stock method) of American common stock outstanding as of July 26, 2010, or $454 million.

| Ratio of Transaction Value Over: | Comparable Transactions | | Total Consideration |
| --- | --- | --- | --- |
| | Range | Median | |
| Proved Reserves ($/Boe) . . . . . . . . . . . . . . . . . . . . | $2.71 – $24.06 | $ 12.88 | $   519.57 |
| Production ($/MBoe/d). . . . . . . . . . . . . . . . . . . . . . | $35,375 – $170,455 | $97,253 | $2,710,950 |

### Selected Corporate Transaction Statistics Analysis

Tudor Pickering reviewed certain corporate transactions in the upstream energy industry with the following criteria: (i) publicly traded target entity, (ii) target entity reserve base comprised of greater than 50% oil, and (iii) announced since 2005. Tudor Pickering conducted a comparable transactions analysis to assess how similar transactions were valued. The selected transactions and year of announcement are set forth below:

- Sandridge Energy Inc./Arena Resources Inc. (2010)

- Denbury Resources Inc./Encore Acquisition Co.   (2009)

- Apollo Global Management/Parallel Petroleum (2009)

- Occidental Petroleum Corp./Vintage Petroleum, Inc. (2005)

- Petrohawk Energy Corp./Mission Resources Corporation (2005)

- Norsk Hydro ASA (ADS)/Spinnaker Exploration Company (2005)

For the comparable transactions analysis, select transaction multiples were analyzed including:

- the transaction value (defined as the equity purchase price plus assumed net debt obligations, if any) over proved reserves;

- the transaction value over daily production; and

- the transaction value over current year and forward year EBITDAX.

Tudor Pickering utilized estimated EBITDAX for this analysis based on internal forecasts prepared by American management and on analyst consensus forecasts. The observed multiple ranges from the comparable transaction analysis as compared to the resulting implied transaction range of multiples resulting from the proposed total consideration are summarized below. For purposes of the following table, total consideration was calculated based on the closing price of Hess common stock of $52.78 on July 26, 2010, multiplied by the exchange ratio of

0.1373, multiplied by the 62.6 million shares (based on the treasury stock method) of American common stock outstanding as of July 26, 2010, or $454 million.

| Ratio of Transaction Value Over: | Range | Median | Total Consideration |
|---|---|---|---|
| Proved Reserves ($/MMBoe) . . . . . . . . . . . . . . . | $9.03 − $41.05 | $16.62 | $519.57 |
| Production ($/Boe/d) . . . . . . . . . . . . . . . . . . . . | $51,951 − $157,794 | $87,363 | $2,710,950 |
| Current Year EBITDAX . . . . . . . . . . . . . . . . . . . | 6.7x − 9.4x | 8.1x | 40.9x − 57.1x |
| Forward Year EBITDAX . . . . . . . . . . . . . . . . . . | 5.0x − 8.4x | 6.4x | 9.5x − 10.0x |

### Selected Transaction Premiums Analysis

Tudor Pickering reviewed certain corporate transactions in the upstream energy industry with the following criteria: (i) 100% stock consideration and (ii) announced since 2001. Tudor Pickering calculated the premium of the $7.25 or $7.36 per share total consideration (calculated by multiplying the 0.1373 exchange ratio by Hess's closing price as of July 26, 2010 and, in the latter case, adding the assumed per share amount of the aggregate $6.9 million special dividend) to the last trading day prior and the trading day seven days prior to the announcement of the transaction and to the 52-week high and 52-week low. The selected transactions and results of the analysis are summarized below:

- Exxon Mobil Corp./XTO Energy Inc. (2009)

- Cimarex Energy Co./Magnum Hunter Resources Inc. (2005)

- Kerr-McGee Corporation/Westport Resources Corp.   (2004)

- Plains Exploration & Production Co./Nuevo Energy Company (2004)

- Whiting Petroleum Corp./Equity Oil Co. (2004)

- Evergreen Resources, Inc./Carbon Energy Corporation (2003)

- Devon Energy Corp./Ocean Energy Inc. (2003)

- Unocal Corp./Pure Resources, Inc. (2002)

- Newfield Exploration Co./EEX Corporation (2002)

- Phillips Petroleum Company/Conoco Inc. (2001)

- Westport Resources Corp./Belco Oil & Gas Corp. (2001)

| | Range | Median | Total Consideration (no Special Dividend) | Total Consideration ($6.9 Million Special Dividend) |
|---|---|---|---|---|
| Premium to 1 Day . . . . . . . . . . . . . . | (4)% to  27% | 11% | 8% | 9% |
| Premium to 7 Days . . . . . . . . . . . . . | (9)% to  29% | 16% | 20% | 22% |
| Premium to 52-Week High . . . . . . . . | (57)% to 22% | (4)% | (6)% | (5)% |
| Premium to 52-Week Low . . . . . . . . | 2%   to 154% | 80% | 565% | 575% |

### Target Price Comparison

Tudor Pickering compared the implied value of the total consideration per share to be received by holders of the American common stock pursuant to the agreement and plan of merger based on the median analyst price target of Hess common stock of $74.00 per share to the median analyst price target of American common stock of $8.50 per share. The premiums of the implied value of the total consideration of $10.16 and $10.27 per share (calculated by multiplying the 0.1373 exchange ratio by Hess's median analyst price target of $74.00 per share and, in the latter case, adding the assumed per share amount of the aggregate $6.9 million special dividend) compared to median analyst target price of American were 20% and 21%, respectively.

47

### Net Asset Valuation Analysis

Tudor Pickering performed an illustrative net asset value analysis of American. Tudor Pickering calculated the present value of the after-tax (including the utilization of American's net operating loss carry-forwards) future cash flows that American could be expected to generate from its estimate of future production and cash flow associated with its producing assets and undeveloped inventory effective July 1, 2010, as provided by the management of American. Tudor Pickering estimated net asset value by adding (i) the present value of the cash flows generated by these producing assets and undeveloped inventory multiplied by probability weightings ranging from 100% to 10% to reflect Tudor Pickering's judgment regarding the relative certainty of the individual reserve categories, less (ii) pre-tax general and administrative expenses as provided by the management of American, less (iii) the expected income taxes to be paid. The resulting asset value was then adjusted by American's estimated net debt amount (total debt less cash) as of September 30, 2010, as provided by management of American, to calculate equity value as of October 1, 2010. All cash flows associated with American's producing assets and undeveloped inventory through 2050 were discounted at a rate of 11% to 15%. This discount rate range was selected based on Tudor Pickering's estimate of the weighted average cost of capital of American. Tudor Pickering utilized Strip commodity prices to derive the cash flows. Based on the foregoing assumptions, the net asset value calculation resulted in an implied American common stock valuation range of $4.34 to $6.16 per share. Tudor Pickering calculated the impact of commodity prices, capital expenditures and the probability weightings applied to the cash flows generated by the producing assets and undeveloped inventory on net asset value discounted at a rate of 11% to 15%. For commodity price sensitivities, Tudor Pickering applied (i) 10 year historical monthly average prices ("10 Year Average") (ii) Wall Street research consensus prices ("Consensus") and (iii) flat pricing using a range of $60 to $100 oil with a 14:1 oil to gas ratio which resulted in an implied American common stock valuation range of $0.30 to $8.74. Tudor Pickering increased and decreased capital expenditures by 20% in the Strip commodity price case, which resulted in an implied American common stock valuation range of $3.10 to $7.48 per share. Tudor Pickering increased and decreased the probability weighting applied to the cash flows generated by the undeveloped inventory by 25% in the Strip commodity price case, which resulted in an implied American common stock valuation range of $2.66 to $8.87 per share.

### Discounted Cash Flow Analysis

Tudor Pickering performed a discounted cash flow analysis of American using financial forecasts through 2016, including the utilization of American's net operating loss carry-forwards, as provided by American. Tudor Pickering utilized Strip commodity prices as described above under "— Commodity Price Assumptions" to derive the cash flows. The cash flows associated with the projected drilling and production activities were multiplied by probability weightings ranging from 100% to 10% to reflect Tudor Pickering's judgment regarding the relative certainty of these activities. Terminal values were calculated at December 31, 2015 using a multiple range of 3.0x to 5.5x 2016E EBITDAX. This range of EBITDAX multiples was based on multiples for companies that Tudor Pickering judged to be similar to American at the terminal value date. Discount rates of 11% to 15% were used to calculate the present value of the annual free cash flows and the terminal value. This discount rate range was selected based on Tudor Pickering's estimate of the weighted average cost of capital of American. The resulting enterprise value was then adjusted by American's estimated net debt amount (total debt less cash) as of September 30, 2010 as provided by management to calculate equity value as of October 1, 2010. Based on the foregoing assumptions, the discounted cash flow calculation resulted in an implied American common stock valuation range of $5.34 to $11.09 per share. Tudor Pickering calculated the impact of commodity price assumptions on discounted cash flow value. For commodity price sensitivities, Tudor Pickering applied (i) 10 Year Average prices (ii) Consensus prices and (iii) flat pricing using a range of $60 to $100 oil with a 14:1 oil to gas ratio. The Consensus commodity pricing assumption applied to the discounted cash flow calculation resulted in an implied American common stock valuation range of $6.22 to $12.02 per share. The 10 Year Average commodity pricing assumption applied to the discounted cash flow calculation resulted in an implied American common stock valuation range of $0.67 to $4.54 per share. The flat commodity pricing assumption applied to the discounted cash flow calculation resulted in an implied American common stock valuation range of $0.89 to $14.14 per share.